**IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MELISSA KITE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DENTOLOGIE, P.C. and DENTOLOGIE ENTERPRISES, INC., | |
| Defendants. | |

Plaintiff Melissa Kite ("Plaintiff") brings this class action complaint individually and on behalf of all others similarly situated against Defendants Dentologie, P.C. and Dentologie Enterprises, Inc. (collectively, "Defendants" or "Dentologie"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Dentologie patients who accessed dental services on the website https://www.dentologie.com/ (the "Website").

2.      Defendants purport to provide patient-centered, expert dental care to its patients.[1]

3.      However, in pursuit of profit and without regard for their patients' medical privacy, Defendants aid, employ, agree, and conspire with third parties, such as Google, LLC ("Google"), to intercept its patients' communications as they seek dental services through the Website. This is achieved through Defendants' secret installation of complex computer code on

---

[1] https://www.dentologie.com/about.

the Website which serves to track and disclose Dentologie patients' activity, in real time, to Google.

4. Confidentiality is paramount to the medical industry. Despite its legal and ethical duties to protect patient information, Defendants undermined the importance of safeguarding the identities and personal medical information of individuals seeking dental services and breached its patients' trust—violating federal and state law, including the Health Insurance Portability and Accountability Act ("HIPAA") and the Illinois Personal Information Protection Act ("PIPA").

5. Healthcare providers, like Dentologie, are legally required to safeguard patients' confidential and sensitive health information. This means that any data related to patients' dental health and treatment history, including patient status, must be kept confidential and secure. Given these protections, patients reasonably expect that information related to their dental health treatment will remain confidential.

6. Unbeknownst to Plaintiff and members of the putative class, and contrary to Defendants' duty as a dental provider, Defendants disclose their patients' protected health information ("PHI") to third parties, including Google, for targeted advertising purposes.

7. Plaintiff brings this action to prevent Defendants from further violating the privacy rights of Dentologie patients and to recover statutory damages for Defendants' unauthorized collection, storage, and use of putative class members' PHI in violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, and the Illinois Eavesdropping Statute ("IES"), 720 ILCS 5/14-1, *et seq*.

**PARTIES**

8.     Plaintiff is, and has been at all relevant times, a resident and citizen of Illinois. In or around May 2023, Plaintiff visited the Website to make an appointment for dental services. At all relevant times hereto, Plaintiff maintained an active Google account.

9.     Unbeknownst to Plaintiff, Defendants disclosed her PHI—including specific details about her dental appointment—to Google for targeted advertising purposes.  Defendants also disclosed sufficient personally identifiable information ("PII") for Google to identify Plaintiff as the specific individual booking her dental appointment, as described more thoroughly below.

10.     After booking an appointment on the Dentologie Website, Plaintiff began receiving targeted advertisements for similar products and services.  Plaintiff would not have booked an appointment on the Website if she knew Defendants were violating her privacy by sharing her PHI with unknown third parties.

11.     At all relevant times Plaintiff maintained an active Gmail account.  When registering for her Gmail account, Google required that she provide her full legal name, date of birth, and gender.  Every time Plaintiff accesses her Gmail account, Google collects information related to her IP address and electronic device (*e.g.*, browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below.  Google utilizes all of these tracking features in order to build robust consumer profiles it can then leverage for targeted advertising purposes.  Plaintiff used the same devices and browsers to access Defendants' Website and her Gmail account.

3

12. Defendant Dentologie, P.C. is an Illinois-based professional corporation with its principal place of business in Chicago, Illinois.

13. Defendant Dentologie Enterprises, Inc. is an Illinois-based corporation with its principal place of business in Chicago, Illinois.

14. Defendants develop, own, and operate the Website. The Website connects patients with dental providers at 17 locations, including 13 Dentologie offices in Chicago, Illinois.

15. Defendants chose to activate Google Analytics on the Website, whereby they disclosed the confidential PHI of their patients with Google for targeted advertising.

### JURISIDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq* ("ECPA"). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendants, so this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005.

17. This Court has personal jurisdiction over Defendants because the Defendants reside in this state and Defendants conduct substantial business in this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

Further, the interception of Plaintiff's personal information occurred in this District.

## FACTUAL ALLEGATIONS

**A.      Dental-Related Health Information is Sensitive and Confidential**

19.      Dentologie owns and operates the Website, where patients can access dental health services, including general and specialized dental care for a wide array of dental services.

20.      Under federal law, a healthcare provider—including dentists—may not disclose personally identifiable information ("PII") or PHI without the patient's express written authorization.

21.      The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[2]

22.      A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." [3]

23.      The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

---

[2] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[3] 42 U.S.C. § 1320d-6.

24. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendants because they are knowingly disclosing individually identifiable health information relating to their patients.

25. Defendants further failed to comply with other HIPAA safeguard regulations as follows:

    a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

    b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

    c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

    d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

    e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

    f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

26. Health care organizations regulated under HIPAA, like Defendants, may use third-party tracking tools in a limited way to perform analysis on data key to operations.

However, they are not permitted to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[4]

27.     The Bulletin discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[5]

28.     Plaintiff and members of the putative class face exactly the risks over which the government expresses concern.  Defendants' unlawful conduct resulted in third parties intercepting information regarding Plaintiff and putative class members' dental health appointments when they accessed Defendants' Website to book appointments for dental services.

29.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

---

[4] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added).

[5] *Id.* (emphasis added).

This information might include an individual's medical record number, home or email address, or **dates of appointments**, as well **as an individual's IP address** or geographic location, medical device IDs**, or any unique identifying code.** [6]

30.     Crucially, the Bulletin continues:

**All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as **IP address** or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care. [7]

31.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health

---

[6] *Id.* (emphasis added).

[7] *Id.* (emphasis added).

information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.** [8]

32.     The FTC is unequivocal in its stance. The FTC has specifically informed healthcare companies, like Defendants, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.

For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

---

[8] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

[I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[9]

33. Therefore, Defendants' conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

34. Defendants' conduct is also contrary to the privacy and confidentiality protections guaranteed by Illinois's Medical Patient Rights Act ("MPRA"), 410 ILCS 50/3(d), and Personal Information Protection Act ("PIPA"), 815 ILCS 530/5.

35. The MPRA protects Plaintiff's and putative class members' medical information from unauthorized disclosures and provides:

Each physician, health care provider, health services corporation and insurance company shall refrain from disclosing the nature or details of services provided to patients, except that such information may be disclosed: (1) to the patient, (2) to the party making treatment decisions if the patient is incapable of making decisions regarding the health services provided, (3) for treatment in accordance with 45 CFR 164.501 and 164.506, (4) for payment in accordance with 45 CFR 164.501 and 164.506, (5) to those parties responsible for peer review, utilization review, and quality assurance, (6) for health care operations in accordance with 45 CFR 164.501 and 164.506, (7) to those parties required to be notified under the Abused and Neglected Child Reporting Act or the Illinois Sexually Transmissible Disease Control Act, or (8) as otherwise permitted, authorized, or required by State or federal law. This right may be waived in writing by the patient or the patient's guardian or legal representative, but a physician or other health care provider may not condition the provision of services on the patient's, guardian's, or legal representative's agreement to sign such a waiver.

410 ILCS 50/3(d).

36. PIPA protects Plaintiff's and putative class members' medical information and personal information from unauthorized disclosure.

---

[9] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

37.     Defendants are "Data Collectors" and subject to the provisions of PIPA.

38.     PIPA provides that:

A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those record from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/459(a).

39.     Both state and federal law protect the PII and PHI that Defendants disclosed

**B.     Google's Advertising Technology**

40.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (*e.g.*, computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

41.     Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

42.     Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

43. A consumer's HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

44. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

45. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The tracking technologies embedded on the Website by Defendants, including Google Analytics, constitute Source Code and function in a substantially similar way to the process described above.

46. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

47. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[10] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year.

---

[10] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

48.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

49.     One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

50.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a

13

persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

51.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

52.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

53.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[11]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[12]

54.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Dentologie patients are booking their appointments.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information

---

[11] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[12] *Id.*

14

related to the specific computing device a consumer (or patient) is using to access a website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

55. In other words, when interacting with the Website, an HTTP Request is sent to Defendants' server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google Analytics.

56. Thus, Defendants are essentially handing their patients a tapped device. Once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendants, and transmits those communications to third parties like Google.

57. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

58. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age,

location, language, and gender, along with interests they express through their online browsing and purchase activities).

59. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

60. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the dental appointments being scheduled by the patient. Google also received the reason for the appointment as well as additional PII, including the patients' IP address, device information, and User-IDs.

61. For example, the Website utilizes Google's "cid" or "Client ID" function to identify patients as they navigate the Website.[13]

62. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

63. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

64. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts

---

[13] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, Owox, https://www.owox.com/blog/use-cases/google-analytics-client-id.

they have installed to generate a unique identifier which can then be used to match a user across websites."[14]

65.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[15]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

66.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[16]

67.     Browser-fingerprints are personal identifiers. Google Analytics can collect browser-fingerprints from website visitors.

68.     As enabled by Defendants, Google collects vast quantities of consumer data through Google Analytics.

69.     Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

70.     Google then utilizes such information for its own purposes, such as targeted advertising.

---

[14] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[15] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

[16] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

**C.      Dentologie Violates the Privacy Rights of its Patients**

71.      Defendants Dentologie P.C. and Dentologie Enterprises Inc. own and operate the Website, which offers patients a variety dental services including, but not limited to, Invisalign appointments, first-visit appointments, emergency dental exams, dental implants, teeth whitening, extractions, scaling and root planning, core buildup removal, dental fillings, root canals, and bone grafts.[17]

72.      Defendants understand the information on the Website is protected and confidential, as indicated by the HIPAA disclosures on their Website, which states "[y]our protected health information may be used and disclosed by your physician, our office staff and others outside of our office that are involved in your care and treatment for the purpose of providing health care services to you, to pay your health care bills, to support the operation of the physician's practice, and any other use required by law."[18]

73.      Contrary to the representations made on their Website, Defendants fail to comply with their obligations under HIPAA.

74.      Defendants, via the Website, allow their patients to book appointments. However, unbeknownst to patients booking appointments via the Website, their personally identifiable and protected health information is being disclosed to third parties.

75.      For example, by embedding Google Analytics onto the Website, Defendants intercept and disclose sensitive details about their patients' confidential dental appointments and personally identifiable information to Google, such as their patient status and the specific procedures for which they are booking appointments.  *See* Figure 1.

---

[17] DENTOLOGIE, OUR SERVICES, https://www.dentologie.com/our-services.
[18] DENTOLOGIE, HIPAA POLICY, https://www.dentologie.com/hipaa.

**Figure 1:**



76.     Defendants further assist Google by disclosing the PII of its patients sufficient for Google to uncover their identities.  For instance, in HTTP communications, the patient's IP address is inherently included in every network request.  In addition to its patients' IP addresses, Defendants, through Google Analytics, disclosed information about their specific devices and User-IDs to Google, allowing Google to link such information to an individual's specific identity.

77.     Defendants also use and cause the disclosure of data sufficient for Google to

19

create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications about their appointment details.

78. Defendants sent these identifiers (*e.g.*, cid, IP address, and device information) with each patient's "event" data.

79. Such event data includes the fact that a patient is seeking medical treatment (*i.e.*, dental services).

80. When patients share their personal information with medical professionals, they expect this information to be kept confidential. Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

81. If patients knew Defendants were sharing their personal information for targeted advertising purposes, they would seek dental services with another company. Through the above-listed third-party tracking services, which Defendants used via the software code installed, integrated and embedded into the Website, Defendants disclosed their patients' legally protected PII and PHI.

82. By installing, integrating and embedding Google Analytics into the Website, and by directing such installation, integration and embedding, Defendants aided and conspired with the third parties and others to allow those third-party entities to contemporaneously and surreptitiously intercept the Website communications of Defendants' patients without the patient's consent.

83. Defendants engage in this deceptive conduct for their own profit at the expense of their patients' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

20

**D.      Tolling of Claims**

84.      Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment of its incorporation of Google Analytics into its Website.

85.      The use of Google Analytics was and is entirely invisible to a website visitor.

86.      Through no fault or lack of diligence, Plaintiff and putative class members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

87.      Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

88.      Defendants had exclusive knowledge that the Website incorporated the tracking technologies and yet failed to disclose to its patients, including Plaintiff and putative class members, that by accessing dental services through the Website, including after logging into their Dentologie accounts, Plaintiff's and putative class members' PHI would be disclosed or released to Google.

89.      Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' PHI.  In fact, Defendants have not presently conceded, acknowledged, or otherwise indicated to its patients that it disclosed or released their PHI to unauthorized third parties.  Accordingly, Defendants are estopped from relying on any statute of limitations.

90.      Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

91.      The earliest that Plaintiff or putative class members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of the Plaintiff's complaint in this matter.

92.     Plaintiff first discovered that Defendants had collected and disclosed her PHI to Google on or around April 2025.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on behalf of all persons in the United States who accessed https://www.dentologie.com/ and booked an appointment for dental services (the "Class").

94.     Plaintiff also brings this action on behalf of all persons in the State of Illinois who accessed https://www.dentologie.com/ and booked an appointment for dental services (the "Illinois Subclass").

95.     Excluded from the Classes are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendants have or have had a controlling interest.

96.     Plaintiff is a member of the Classes she seeks to represent.

97.     The Classes are so numerous that joinder of all members is impractical. Although Plaintiff does not yet know the exact size of the Classes, it is believed that there are at least thousands of Class members.

98.     The Classes are ascertainable because the Class members can be identified by objective criteria – all individuals who accessed https://www.dentologie.com/ for dental services. Individual notice can be provided to Class members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

99.     There are numerous questions of law and fact common to the Classes, which predominate over any individual actions or issues, including but not limited to:

22

a. Whether Defendants gave the Class members a reasonable expectation of privacy that their information was not being shared with third parties;

b. Whether Defendants' disclosure of information constitutes a violation of the claims asserted;

c. Whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

d. Whether Plaintiff and Class members have sustained damages as a result of Defendants' conduct and if so, what is the appropriate measure of damages or restitution.

100. Plaintiff's claims are typical of the claims of the members of the Classes, as all members are similarly affected by Defendants' wrongful conduct. Plaintiff has no interests antagonistic to the interests of the other members of the Classes. Plaintiff and all members of the Classes have sustained economic injury arising out of Defendants' violations of law as alleged herein.

101. Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

102. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation

23

increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims are consistently adjudicated.

103. Plaintiff reserves the right to revise her allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### COUNT I
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq.***

104. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

105. Plaintiff brings this claim on behalf of herself and members of the Class against Defendants.

106. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

107. The ECPA protects both the sending and receipt of communications.

108. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

109. The transmission of Plaintiff's PII and PHI to Defendants' Website qualify as a

24

"communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

110. The transmission of PII and PHI between Plaintiff and Class members and Defendants' Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

111. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

112. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

113. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

114. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Google used to track Plaintiff and Class members communications while they were navigating the Website;

b. Plaintiff's and Class members' browsers;

c. Plaintiff's and Class members' mobile devices;

d. Defendants' and Google's web and ad servers;

e. The plan Defendants and Google carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they

were using a web browser to navigate the Website.

115. Plaintiff and Class members' interactions with Defendants' Website are electronic communications under the ECPA.

116. By utilizing and embedding Google Analytics on their Website, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

117. Specifically, Defendants intercepted Plaintiff's and Class members' electronic communications through Google Analytics, which tracked, stored and unlawfully disclosed Plaintiff's and Class members' PII and PHI to third parties, such as Google.

118. Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their treatment information. This confidential information was then matched to patients' Google accounts and monetized for targeted advertising purposes.

119. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

120. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

26

121. Defendants intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

122. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendants violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[19]

123. Plaintiff's information that Defendants disclosed to Google qualifies as IIHI, and Defendants violated Plaintiff's and Class members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendants used the wire or electronic communications to increase their profit margins. Defendants specifically used Google Analytics to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

124. Defendants were not acting under the color of law to intercept Plaintiff's and

---

[19] 42 U.S.C. § 1320d-6.

Class members' wire or electronic communications.

125. Plaintiff and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy through Google Analytics. Plaintiff and Class members, all of whom are patients of Defendants, had a reasonable expectation that Defendants would not redirect their communications to Google without their knowledge or consent.

126. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

127. As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

**COUNT II**
**Violations of the Illinois Eavesdropping Act**
**720 ILCS § 5/14-1, *et seq.***

128. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

129. Plaintiff brings this claim on behalf of herself and members of the Illinois Subclass against Defendants.

130. The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, *et seq.*, prohibits the surreptitious[20] interception, recording, or transcription of privacy electronic communications[21] without the consent of all parties to the conversation and provides a civil

---

[20] Surreptitious means "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS § 5/14-1(g).

[21] Private electronic communications are "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS § 5/14-1(e).

cause of action to a person subjected to a violation of the IES against eavesdroppers[22] and their principals.[23]

131. Interception. Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication.

132. Use of Confidential Information. Under 720 ILCS § 5/14-2(a)(5), the IES makes it unlawful for a person to knowingly and intentionally use or disclose any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the IES, unless he or she does so with the consent of all of the parties.

133. Possession of Confidential Information. Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

134. Plaintiff's and Class members' communications with Defendants constituted

---

[22] Eavesdropper means "any person . . . who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the IES] or who acts as a principal[.]" 720 ILCS § 5/14-1(b).
[23] Principals include persons who "[k]nowingly derives any benefit or information from the illegal use of an eavesdropping device by another" or "[d]irects another to use an eavesdropping device illegally on his or her behalf." 720 ILCS § 5/14-1(c).

private electronic communications. Plaintiff and Class members transmitted their communications to Defendants from their computers or by wire, intended the communications to be private, and reasonably expected the communications to be private under HIPAA.

135. Google was not party to Plaintiff's and Class Members' private electronic communications with Defendants. Plaintiff and Class members believed they were only communicating with Defendants, intended their communications to be directed at Defendants only, and were unaware of the presence of the Tracking Technologies that redirected their communications to Google.

136. Google's interception Plaintiff's and Class Members' private electronic communications were knowing, intentional, and surreptitious. Google intentionally designed Google Analytics to be concealed on websites to intercept private communications. Google knew its tracking technology could and did, intercept private electronic communications without the consent of Plaintiff and Class members.

137. Google used and disclosed Plaintiff's and Class members' intercepted communications for marketing and advertising use.

138. The interception of PHI was done without Plaintiff's and Class members' consent, in violation of 720 ILCS § 5/14-2(a)(3) and (a)(5).

139. Defendants acted as Google's "principal" under the IES. By using Google Analytics on the Website, Defendants permitted Google to illegally eavesdrop on Plaintiff's and Class members' private communication of PHI and IIHI and Defendants derived benefits eavesdropping in the form of marketing and advertisement.

140. Defendants further violated 720 ILCS § 5/14-2(a)(4) by possessing the tracking technologies, knowing they were useful for surreptitiously intercepting private electronic

30

communications contrary to the IES.

141.    Defendants' violations of the IES were wanton, reckless, and/or malicious.

142.    Plaintiff and Class members seek actual damages, punitive damages, injunctive relief, and any other relief the Court deems just due to Defendants' violations of the IES.

## COUNT III
### Negligence

143.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

144.    Plaintiff brings this claim on behalf of herself and members of the Classes against Defendants.

145.    Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

146.    As a provider of health care under the law, Defendants had a special relationship with Plaintiff and Class members who entrusted Defendants to adequately protect their PII and PHI.

147.    Defendants knew that the PII and PHI at issue was private and confidential and should be protected as private and confidential.  Thus, Defendants owed a duty of care not to subject Plaintiff and Class members to an unreasonable risk of unauthorized disclosure.

148.    Defendants knew, or should have known, of the risks inherent in collecting and storing PII and PHI and allowing it to be accessed by unauthorized third parties.

149.    Defendants' failure to take proper security measures to protect Plaintiff's and Class members' PII and PHI created conditions conducive to a foreseeable risk of unauthorized

31

access and disclosure of such confidential information to unauthorized third parties. As described above, Plaintiff and Class members are part of a foreseeable, discernable group that was at high risk of having their confidential information compromised, and otherwise wrongly disclosed if not adequately protected by Defendants.

150. Defendants had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class members' PII and PHI.

151. Defendants owed a duty to timely and adequately inform Plaintiff and Class members that their PII and PHI was being improperly disclosed to unauthorized third parties.

152. Defendants systematically failed to provide adequate security for data in its possession or over which it had supervision and control.

153. Defendants, through their actions and omissions, unlawfully breached duties to Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class members' PII and PHI within Defendants' possession, supervision, and control.

154. Defendants, through their actions and omissions, unlawfully breached duties owed to Plaintiff and Class members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class members' PII and PHI.

155. Defendants, through their actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class members that the PII and PHI within Defendants' possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

156. Defendants' breach of duties owed to Plaintiff and Class members proximately

caused Plaintiff's and Class members' PII and PHI to be compromised by being accessed by unauthorized third parties.

157. As a result of Defendants' ongoing failure to adequately notify Plaintiff and Class members regarding what type of PII and PHI has been compromised, Plaintiff and Class members are unable to take the necessary precautions to mitigate damages.

158. As a proximate result of Defendants' negligence and breach of duties as set forth above, Defendants' breaches of duty caused Plaintiff and Class members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

159. In failing to secure Plaintiff's and Class members' PII and PHI, Defendants are guilty of oppression, fraud, or malice. Defendants acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Classes.

160. Defendants' conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class members' PII and PHI, and as a result, Plaintiff and Class members have suffered and will continue to suffer damages as a result of Defendants' conduct. Plaintiff and Class members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendants' negligence.

33

<u>**COUNT IV**</u>
**Breach of Confidence**

161. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

162. Plaintiff brings this claim on behalf of herself and members of the Classes against Defendants.

163. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

164. Plaintiff and Class members had reasonable expectations of privacy in their communications exchanged with Defendants, including communications exchanged on Defendants' Website.

165. Contrary to its duty as a medical provider and its express promises of confidentiality, Dentologie installed Google Analytics to disclose and transmit Plaintiff's and Class members' communications, including their PII and PHI, to unauthorized third parties, like Google.

166. These disclosures were made without Plaintiff's or Class members' knowledge, consent, or authorization, and were unprivileged.

167. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

168. As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendants' breach in that:

    a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendants eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendants took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

h. Defendants' actions diminished the value of Plaintiff's and Class members' PII and PHI; and

i. Defendants' actions violated the property rights Plaintiff and Class members have in their PII and PHI.

## COUNT V
### Unjust Enrichment

169. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

170. Plaintiff brings this claim on behalf of herself and members of the Classes against Defendants.

171. Defendants benefit from the use of Plaintiff's and Class members' PII and PHI and unjustly retained those benefits at their expense.

35

172.     Plaintiff and Class members conferred a benefit upon Defendants in the form of PII and PHI that Defendants collected from Plaintiff and Class members, without authorization and proper compensation.  Defendants consciously collected and used this information for its own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

173.     Defendants unjustly retained those benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

174.     The benefits that Defendants derived from Plaintiff and Class members was not offered by Plaintiff and Class members gratuitously and rightly belongs to Plaintiff and Class members.  It would be inequitable under unjust enrichment principles in Illinois and every other state for Defendants to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

175.     Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

### COUNT VI
### Breach of Implied Contract

176.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

177.     Plaintiff brings this claim on behalf of herself and members of the Classes against Defendants.

178.     As a condition of utilizing Defendants' digital platforms and receiving services from Defendants, Plaintiff and Class members provided their PII and PHI and compensation for

their dental care.

179.    When Plaintiff and Class members provided their PII and PHI to Defendants, they entered into implied contracts pursuant to which Defendants agreed to safeguard and not disclose their PII and PHI without consent.  Plaintiff and Class members would not have entrusted Defendants with their PII and PHI in the absence of an implied contract between them and Defendants, obligating Defendants to not disclose PII and PHI without consent.

180.    Defendants breached these implied contracts by disclosing Plaintiff's and Class members' PII and PHI to Google.  As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiff and Class members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their PII and PHI.

181.    Plaintiff and Class members are entitled to compensatory and consequential damages as a result of Defendants' breach of implied contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the proposed Classes, that the Court enter judgment in her favor and against Defendants as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For actual, compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

37

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: June 23, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Alec M. Leslie*
Alec M. Leslie

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
Email: sbeck@bursor.com

*Counsel for Plaintiff*